UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re

ALIANZA TRINITY DEVELOPMENT
GROUP, LLC,

Case No.: 16-24483-BKC-AJC
Chapter 11 Proceeding

      Debtor.

_____/

**DEBTOR'S EMERGENCY MOTION PURSUANT TO U.S.C. § 364
AND BANKRUPTCY RULE 4001 FOR ENTRY OF INTERIM AND
FINAL ORDERS AUTHORIZING DEBTOR TO OBTAIN
POST-PETITION FINANCING SECURED BY A PRIMING LIEN
AND A SUPER-PRIORITY ADMINISTRATIVE EXPENSE CLAIM**

**(HEARING REQUESTED FOR NOVEMBER 30, 2016)[1]**

**BASIS FOR EMERGENCY AND
SUMMARY STATEMENT OF RELIEF REQUESTED**

**The Debtor seeks emergency relief and respectfully requests a hearing on
this motion no later than November 30, 2016 because the Debtor does not
have sufficient funds to pay critical operational expenses during the high
customer traffic holiday period. The Debtor is engaged in the business of
acquiring, owning and developing 4,764 acres of real estate in the mountains
near Asheville, North Carolina, consisting of home sites, a hotel site,
condominiums, an operating equestrian center, golf club and restaurant that
are used by the residents (the "Property"). The facilities are managed and
operated by the Debtor's affiliate, Brights Creek Golf Club, LLC ("BC")
which since July 8, 2016 has been in the possession of a Receiver, Marc
Rudow, appointed by the United States District Court for the Western
District of North Carolina (case no. 1:16-cv-00107). If authorization to obtain
credit is granted, the funding would be advanced to the Debtor's DIP bank
account and remitted by the Debtor to BC's Receiver upon the Debtor's
receipt of an itemized draw request from BC's Receiver to pay expenses
under the attached budget. Immediate, substantial and irreparable harm will
occur to the estate's creditors if this motion is not granted on an interim
basis, approving the Debtor's authority to use $300,000.00 of the DIP Facility
(defined below) pursuant to the budget attached hereto as _Exhibit "1."_**

---

[1]  A hearing on the Debtor's application to employ Levine Kellogg Lehman Schneider + Grossman LLP as its
bankruptcy counsel is scheduled to be heard by the Court on November 30, 2016 at 10:30 am.

EC16089 (11/28/2016 7:53 PM)

The Debtor seeks the entry of an order authorizing it to enter into a secured post-petition financing agreement to obtain up to $750,000.00 (the "DIP Loan" or "DIP Facility") from Lantern Business Credit, LLC (the "Lantern" or "DIP Lender") to be used in accordance with the budget attached hereto as *Exhibit "1,"* with the proceeds of the DIP Loan to be deposited in the Debtor's DIP bank account for use by BC's Receiver to pay essential budget items in order to facilitate the continued operations of the Debtor. The DIP Loan will mature on March 17, 2017. The Debtor will pay a non-default 14% interest rate per year for the DIP Loan or, in the event of a default by the Debtor, the interest rate will be 19% per year. Events of default include the Debtor causing the termination of the management company retained by the Receiver for BC, the removal of BC's Receiver, conversion or dismissal of this bankruptcy case, the filing of a plan of reorganization or the entry of a confirmation order that do not provide for payment in full of the DIP Loan, appointment of a Chapter 11 Trustee or Examiner, entry of an order granting liens or claims that are senior or *pari passu* to the liens granted to the DIP Lender, failure to make all payments under the DIP Facility, and breaches of other terms of the DIP Facility as set forth on attached *Exhibit "2."* As more fully set forth on page 5 of *Exhibit "2"*, the DIP Loan will be secured by a first lien on the Debtor's Property (defined below), junior only to the Carve-Out (as defined at pages 16-17 of *Exhibit "2"*) and valid and properly perfected pre-petition liens. The DIP Loan shall be further secured by a super-priority administrative expense claim under § 364(c)(1) with priority over all administrative expenses except the Carve-Out, but will not be paid from avoidance action recoveries. As set forth in *Exhibit "2"* at pages 8-9, advances under the DIP Loan are premised upon the Debtor's compliance with deadlines for certain milestones to be accomplished towards the sale of its Property, the proceeds of which shall be paid directly to the DIP Lender and applied first to pay the fees and professional fees under the DIP Loan, second to pay real estate taxes for the Property, third to pay the remaining indebtedness under the DIP Loan and fourth to pay the remaining indebtedness of the pre-petition secured debt of Lantern Business Credit, LLC, the Debtor's pre-petition secured creditor ("Lantern" or "Pre-Petition Lender"). Pursuant to Bankruptcy Rule 4001(c) and as further summarized below: the Pre-Petition Lender will receive adequate protection; except for the Debtor's right to challenge the Pre-Petition Lender's Disputed Fee defined at page 18 of *Exhibit "2,"* the Debtor shall release claims against the Pre-Petition Lender, which shall be binding upon all parties in interest unless an adversary proceeding is filed prior to the expiration of 45 days after the Petition Date that challenges the Pre-Petition Lender's liens; and upon an event of default or termination of the DIP Facility, the DIP Lender shall be entitled to enforce its rights including the foreclosure or sale of the Debtor's Property without Bankruptcy Court approval, subject to a five (5) day advanced notice of the remedies to be exercised and the Debtor or Committee seeking an injunction no later than five (5) days after the notice is provided.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

Alianza Trinity Development Group, LLC (the "Debtor"), pursuant to 11 U.S.C. §364, Rule 4001 of the Federal Rules of Bankruptcy Procedure, Local Rules 4001-3, 9013 (F) and (H) and 9075-1 and the Court's Guidelines for motions seeking post-petition financing, moves for the entry of an order providing for the following relief: (a) authorizing the Debtor to obtain post-petition credit up to $750,000.00 (the "DIP Loan" or "DIP Facility") from Lantern Business Credit, LLC ("Lantern" or the "DIP Lender"), including the use of $300,000.00 of the DIP Loan on an interim basis pursuant to the budget attached as **Exhibit "1,"** to avoid immediate and irreparable harm, for deposit into the Debtor's DIP bank account and use by the Receiver of the Debtor's affiliate, Brights Creek Golf Club, LLC ("BC") which operates and manages the Debtor, to pay expenses critical to the Debtor's operations pending a sale of the Debtor's Property (defined below) or the refinancing of the indebtedness due under the DIP Loan and pre-petition secured loan; (b) authorize the Debtor to grant the DIP Lender a first lien on the Debtor's Property, junior only to a Carve-Out (defined below) and valid, properly perfected pre-petition liens; (c) authorize the Debtor to further secure repayment of the DIP Loan by granting the DIP Lender a super-priority administrative expense claim under section 364(c)(1) that is only subordinate to the Carve-Out; and (d) authorize the Debtor to provide the pre-petition secured lender, Lantern Business Credit, LLC ("Lantern" or "Pre-Petition Lender") adequate protection of its interests in the form of: (i) a priority claim over all expenses except the Carve-Out and the super-priority administrative expense claim of the DIP Lender, subject to the Debtor's right to challenge the Disputed Fee (defined below) and the filing of an adversary proceeding challenging the Pre-Petition Lender's liens 45 days after the Petition Date and (ii) replacement liens to the extent of any diminution in the value of the collateral as of the Petition Date that

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

secures the Pre-Petition Lender's pre-petition liens.  As grounds in support of this motion (the "Motion"), the Debtor states as follows:

## JURISDICTION AND VENUE

This Court has jurisdiction to consider this motion (the "Motion") pursuant to 28 U.S.C. §§ 157 and 1334.  The subject matter of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district pursuant to 28 U.S.C. § 1408.

## BACKGROUND

On October 27, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

Since the Petition Date, the Debtor has been operating its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date of the filing of this Motion, a creditors committee ("Committee") has not been appointed or designated in this case.  In addition, no request for the appointment of a trustee or examiner has been made.

The Debtor is a limited liability company organized and existing under the laws of the State of Florida and is engaged in business of acquiring, owning and developing 4,764 acres of real estate in the mountains near Asheville, North Carolina, consisting of home sites and a hotel site, condominiums, an operating equestrian center, golf club and restaurant that are used by the residents (the "Property").  This bankruptcy case was filed to preserve substantial equity in the Debtor's Property before a foreclosure sale of the Property on October 28, 2016. Emergency relief is requested to obtain operating funds for these facilities during the high customer traffic holiday period.  The facilities are managed and operated by the Debtor's affiliate, Brights Creek Golf Club, LLC ("BC") which since July 8, 2016 has been in the possession of a Receiver, Marc Rudow, appointed by the United States District Court for the Western District of North Carolina

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

(case no. 1:16-cv-00107). If authorization to obtain credit is granted, the funding would be advanced to the Debtor's DIP bank account and remitted by the Debtor to BC's Receiver upon the Debtor's receipt of an itemized draw request from BC's Receiver to pay expenses under the attached budget.

The DIP Lender, Lantern Business Credit, LLC ("Lantern") is also the Debtor's Pre-Petition Lender, which asserts a $14 million secured claim. The Debtor disputes the amount of the Pre-Petition Lender's alleged secured claim in part and its rights are reserved to challenge the Disputed Fee as defined in the DIP Loan Agreement and summarized below.

## RELIEF REQUESTED

### Proposed DIP Loan Agreement

The Debtor's Property is encumbered by pre-petition liens in favor of the Pre-Petition Lender and, accordingly, the Debtor could not obtain financing on an unsecured administrative expense basis under § 364(b) of the Bankruptcy Code, nor would any independent third-party lender provide financing solely with a super-priority claim under § 364(c)(1) of the Bankruptcy Code or the granting of junior liens under § 364(c)(3) of the Bankruptcy Code.  The Debtor sought other sources of funding but all proposals received required priming liens and fees and expenses, including engaging a valuation expert, which the Debtor could not fund in time to meet the emergency operational needs of its Property. Pursuant to the terms of the DIP Facility Agreement, a copy of which is attached hereto as **Exhibit "2,"** the DIP Facility provides for advances totaling $750,000.00 for use by BC's Receiver to pay critical operating expenses of the Debtor including BC's payroll, as BC's employees, including employees of the management company retained by the Receiver for BC, are essential to facilitate the operations of the Debtor. By way of this Motion, the Debtor also seeks interim relief for the funding of $300,000.00 from

the DIP Facility, pending final approval of the DIP Facility, in order to avoid the immediate and irreparable shut down of the Debtor's operations due to non-payment of the expenses essential to the Debtor's operations, so that BC's Receiver can pay the November and December 2016 expenses that directly impact the Debtor's operations in accordance with the budget attached hereto as **Exhibit "1."**

As required by Bankruptcy Rule 4001(c), following is a summary of significant terms of the DIP Loan Agreement:

- The DIP Lender shall be granted a priming lien, senior to the lien of the Pre-Petition Lender on the Debtor's Property, junior only to a carve-out for unpaid post-petition fees and expenses of the Clerk of the Bankruptcy Court and the U.S. Trustee and up to $75,000.00 of the post-petition fees and expenses incurred by the Debtor's professionals and a Committee, if appointed (the "Carve-Out"). See Exhibit "2" at pages 5 and 16-17.

- To secure repayment of the DIP Facility, the DIP Lender shall also be granted a super-priority administrative expense claim under section 364(c)(1) of the Bankruptcy Code with priority over any other administrative expenses of the estate except for the Carve-Out, however, the super-priority administrative expense claim of the DIP Lender shall not be paid from avoidance action recoveries. See Exhibit "2" at page 5.

- The Pre-Petition Lender shall receive adequate protection of its interests in the form of a priority claim over all expenses except the Carve-Out and the super-priority administrative expense claim of the DIP Lender, subject to (i) the Debtor's right to challenge the pre-payment fee and interest thereon under the pre-petition loan documents, as well as additional interest charged in excess of the amount owed to the Pre-Petition Lender under the pre-petition loan documents consisting of principal, accrued interest at the contract and default rates and reasonable fees and expenses, including reasonable attorney's fees and expenses (the "Disputed Fee") and (ii) any other party in interest's right to file an adversary proceeding prior to the expiration of 45 days after the Petition Date challenging the Pre-Petition Lender's liens (the "Review Period"). See Exhibit "2" at pages 6-7and 18. The Pre-Petition Lender shall also receive adequate protection in the form of replacement liens to the extent of any diminution in the value of its collateral as of the Petition Date that secures the Pre-Petition Lender's pre-petition liens. See Exhibit "2" at page 7.

- Other than the Debtor's right to challenge the Disputed Fee and subject to the rights of a non-Debtor to challenge the Pre-Petition Lender's liens during the Review Period, the Debtor and its bankruptcy estate release and discharge the Pre-Petition Lender, its affiliates and its representatives from all claims and causes of action. See Exhibit "2" at page 6.

6

- As part of the remedies available to the DIP Lender if there is an event of default under the DIP Facility, the DIP Lender shall be entitled to foreclose or sell the Debtor's Property without further order of the Bankruptcy Court, except that the DIP Lender must provide the Debtor with 5 days advanced notice of its intent to exercise remedies and the Debtor or a Committee, if appointed, shall have 5 days from the notice to seek an injunction. See Exhibit "2" at pages 11-12.

Other material terms of DIP Loan Agreement are as follows:

- Interest shall accrue on all outstanding advances under the DIP Facility at a per annum non-default rate of 14% and, if an event of default occurs, interest shall accrue at a per annum rate of 19% . See Exhibit "2" at page 3.

- The DIP Loan will mature on March 17, 2017. See Exhibit "2" at page 19.

- Events of default include the Debtor causing the termination of the management company retained by the Receiver for BC, the removal of BC's Receiver, conversion or dismissal of this bankruptcy case, the filing of a plan of reorganization or the entry of a confirmation order that do not provide for payment in full of the DIP Loan, appointment of a Chapter 11 Trustee or Examiner, entry of an order granting liens or claims that are senior or *pari passu* to the liens granted to the DIP Lender, failure to make all payments under the DIP Facility, and breaches of other terms of the DIP Facility. See Exhibit "2" at pages 12-15.

- Advances under the DIP Loan are premised upon the Debtor's compliance with deadlines for certain milestones to be accomplished towards the sale of its Property, the proceeds of which shall be paid directly to the DIP Lender and applied first to pay the fees and professional fees under the DIP Loan, second to pay real estate taxes for the Property, third to pay the remaining indebtedness under the DIP Loan and fourth to pay the remaining indebtedness of the Pre-Petition Lender. Notwithstanding the Debtor's efforts to negotiate terms for a longer marketing period for sale of the Property, the earliest milestone is December 9, 2016 by which the Debtor must file an application to retain a broker and the last milestone is the closing of the sale of the Debtor's Property to occur no later than 14 days after the Bankruptcy Court enters an order approving the sale (the order is to be entered no later than March 3, 2017), although the DIP Lender and Pre-Petition Lender will consider extensions of the milestone deadlines if recommended by the broker. See Exhibit "2" at pages 9-10

- The proceeds of the DIP Loan will be funded into the Debtor's DIP bank account and remitted by the Debtor to BC's Receiver upon the Debtor's receipt of an itemized draw request from BC's Receiver to pay expenses under the attached budget. See Exhibit "2" at page 1.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

## ARGUMENT

Section 364(d) of the Bankruptcy Code authorizes a debtor to obtain post-petition financing secured by a loan on property of the estate that is equal or senior to the lien of a pre-petition lender, provided, the debtor is unable to obtain credit otherwise and the lien of the pre-petition secured creditor is adequately protected. In this case, the Debtor has diligently inquired among a number of potential lenders for debtor-in-possession financing by way of a lien junior to the Pre-Petition Lender's lien and no lender is willing to loan money to the Debtor other than on a senior secured basis. In consideration for the priming lien granted to the DIP Lender, however, the Pre-Petition Lender is receiving sufficient adequate protection as detailed herein and as set forth on Exhibit "2." Additionally, given that Lantern is both the Pre-Petition Lender and DIP Lender, the DIP Loan Agreement poses no risk or prejudice to Lantern.

## CONCLUSION

For the foregoing reasons, the Debtor urges this Court to approve the proposed DIP Loan Agreement and, thereby, enter an order granting the relief requested herein.

Respectfully submitted,

**LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP**
*Proposed Attorneys for Debtor*
Miami Center, 34th Floor
201 S. Biscayne Boulevard
Miami, Florida 33131
Telephone: 305.403.8788
Facsimile: 305.403.8789

By:  /s/ Thomas R. Lehman ____
    THOMAS R. LEHMAN, P.A.
    FL Bar No. 351318
    E-mail: trl@lklsg.com
    ROBIN J. RUBENS, ESQ.
    FL Bar No. 959413
    E-mail: rjr@lklsg.com

8

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Motion together with the attached exhibits were served on November 28, 2016 via the Court's CM/ECF filing system to all recipients registered to receive notices of electronic filings generated by CM/ECF for this case and that a supplemental certificate of service will be filed evidencing service of the foregoing Motion and attached exhibits on November 29, 2016 via U.S. Mail to the addressees listed thereon.

By:  /s/ Thomas R. Lehman
        Thomas R. Lehman

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

**Brights Creek Golf Club**
**Revised 30/60/90 Cash Needs Estimate**

| November | | December | | January | |
|---|---|---|---|---|---|
| Payroll 11/11/2016 | $60,000 | Payroll 12/9/2016 | $50,000 | Payroll 1/6/2017 | $45,000 |
| Payroll 11/25/2016 | 50,000 | Payroll 12/23/2016 | 50,000 | Payroll 1/20/2016 | 45,000 |
| DLL Payment | 23,316 | DLL Payment | 23,316 | DLL Payment | 23,316 |
| Estimated Operating Expenses | 130,698 | Estimated Operating Expenses | 100,000 | Estimated Operating Expenses | 90,000 |
| Management Fee East West | 10,000 | Management Fee East West | 10,000 | Management Fee East West | 10,000 |
| Manager, Kathee Dishner | 7,500 | Manager, Kathee Dishner | 7,500 | Manager, Kathee Dishner | 7,500 |
| Receiver | 10,000 | Receiver | 10,000 | Receiver | 10,000 |
| Total for month | $291,514 | Total for month | $250,816 | Total for month | $230,816 |
| Revenue and Cash on hand | | Revenue and Cash on hand | | Revenue and Cash on hand | |
| Estimated 2016 Nov Revenue | 100,000 | Estimated 2016 Dec Revenue | 60,000 | Estimated Jan 2017 Revenue | 50,000 |
| Cash on hand to start month: | 100,000 | Cash on hand to start month: | 0 | Cash on hand to start month: | 0 |
| Net Negative Cash | -91,514 | Net Negative Cash | -190,816 | Net Negative Cash | -180,816 |

Note: Estimates are based on assumptions which may or may not occur and variations to these estimates may be significant.

**Exhibit "1"**

**Alianza Trinity Development Group LLC**
**Terms and Conditions**
**Proposed Senior Secured, Super-Priority**
**Debtor-in-Possession Credit Facility**

*The terms outlined below in this Terms and Conditions (this "**DIP Term Sheet**") are the terms and conditions for a senior secured, super-priority debtor-in-possession credit facility (such post-petition credit facility, the "**DIP Facility**") to be made available to the Debtor (as defined below). This DIP Term Sheet and the Interim Order and Final Order (as defined below) shall collectively constitute the exclusive and definitive documentation and agreement among the parties for the DIP Facility (such documentation, the "**DIP Financing Documents**"). Capitalized terms not otherwise defined in this DIP Term Sheet shall have the meanings ascribed to them in that certain Loan Agreement dated as of July 10, 2015 by and among Lantern Business Credit, LLC (as Lender), the Debtor and Bright's Creek Golf Club, LLC (such agreement, as amended, the "**Pre-Petition Loan Agreement**"), a copy of which is attached as Exhibit A to the Debtor's motion requesting approval of the DIP Facility.*

| | |
|---|---|
| **Debtor:** | Alianza Trinity Development Group LLC |
| **Amount and Type of Facility:** | After entry of the Interim Order (as defined below), the DIP Facility will consist of: a credit line of up to seven hundred fifty thousand dollars ($750,000.00) (the "**Maximum DIP Advance Amount**"). The Maximum DIP Advance Amount may be further increased from time to time only with the written consent of the Debtor and DIP Lender. |
| **DIP Lender:** | Lantern Business Credit, LLC (the "**DIP Lender**"). |
| **Borrowing Availability:** | All borrowings under the DIP Facility shall be limited by the Budget (defined below). The Budget shall be approved by DIP Lender in its sole discretion after consultation with the Bright's Creek Receiver and the Debtor, and cover the time periods as more particularly described in the definition of such term below. The Budget may be further modified and amended from time to time only with the consent of DIP Lender. |
| **Advances:** | Unless otherwise required by the U.S. Trustee and/or Bankruptcy Court, all borrowings under the DIP Facility shall be funded directly to the Debtor's DIP bank account. Upon the Bright's Creek Receiver delivering the Debtor an itemized draw request to pay expenses under the Budget, the Debtor shall promptly issue and deliver a DIP account check for the total amount of the draw to the Receiver. On the 10th business day of the month the Receiver shall provide the Debtor and DIP Lender an accounting of the revenue received and expenses |

#48544785

**Exhibit "2"**

paid by the Receiver the preceding month and include an explanation of the reasons for any variances from the Budget in excess of ten percent (10%). The first draw of the Receiver shall be a total of $282,330 to fund expenses for the months of November and December, 2016. The accounting by the Receiver shall be retroactive to the petition date.

**Fees:**                The Debtor agree to pay Lender a DIP Commitment Fee of $15,000, as the same may be increased by an amount equal to two-percent (2.0%) of any increase to the Maximum DIP Advance Amount.

The Debtor also agree to pay the costs and expenses of DIP Lender as set forth in the Section titled "Fees and Expenses" below.

**Termination Date:**        The earliest to occur of: (a) the Maturity Date (as defined below); (b) December 30, 2016 if the Final Order has not been entered; (c) acceleration of the obligations under the DIP Facility; (d) the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations owing under the Pre-Petition Loan Documents (without limiting the Debtor's right to challenge the Disputed Fee) and the DIP Facility and is otherwise acceptable to DIP Lender; (e) the date which is the closing date of any sale of all or substantially all of the Debtor's assets; (f) the entry of an order by the Bankruptcy Court (as defined below) granting (i) relief from the automatic stay permitting foreclosure of any assets of any Debtor with a value in excess of $100,000 in the aggregate (unless consented to by DIP Lender in writing), (ii) any notice by DIP Lender to terminate the use of cash collateral or lift the stay or otherwise exercise remedies against any cash collateral, (iii) a motion or other pleading requesting (or entry of an order approving) the appointment of a trustee or an estate fiduciary or an examiner with special powers, or (iv) approving a motion for the dismissal or conversion of any of the Chapter 11 Case (as defined below); (g) the filing or support by any Debtor of a plan of reorganization that is not acceptable to DIP Lender or does not provide for indefeasible payment in full, in cash of all obligations owing under the Pre-Petition Loan Documents (without limiting the Debtor's right to challenge the Disputed Fee) and DIP Facility; (h) entry of a Bankruptcy Court order granting liens or claims that are senior or *pari passu* to the liens granted in favor of the DIP Lender under the DIP Financing Documents; and (i) such other date as is agreed to by DIP Lender and Debtor, in writing. The date on which the earliest of clauses (a) through (i) above occurs being referred to hereinafter as the "**Termination Date**." On the Termination Date, Debtor's ability to borrow pursuant to the DIP Facility shall be deemed

2

terminated, and DIP Lender shall have no further obligation to provide financing pursuant to the DIP Facility or DIP Financing Documents.

**Interest Rate and Payment Terms:**

Interest shall accrue on all outstanding advances under the DIP Facility at a per annum floating rate equal to fourteen percent (14%) per annum (the "**Non-Default Interest Rate**"). Effective immediately upon the occurrence of an Event of Default unless waived in writing by DIP Lender in its sole discretion, interest on the outstanding loans under the DIP Facility shall accrue at a rate that is five-percent (5%) per annum in excess of the Non-Default Interest Rate. All interest, fees and expenses under the DIP Facility shall be paid in kind, and not in cash, by capitalizing such interest, fees and expenses as principal of the outstanding principal balance of the indebtedness under the DIP Facility as of the 1st day of each calendar month (or with respect to fees and expenses when invoiced) (and for the avoidance of doubt, interest shall accrued on such capitalized interest, fees and expenses). If any other term or condition of this Term Sheet conflicts or varies with the terms of the preceding sentence, the terms of the preceding sentence shall govern.

Interest with respect to any outstanding obligations under the Pre-Petition Loan Agreement shall, to the extent permitted by applicable bankruptcy law, accrue from and after the Petition Date at the Default Rate (as defined in the Pre-Petition Loan Agreement) (unless otherwise ordered by the Bankruptcy Court) and be due and payable by the Debtor on the date that the full amount of the DIP Facility is immediately due and payable (unless otherwise ordered by the Bankruptcy Court).

**Loan Payments:**

The Debtor jointly and severally promise and agree to pay to the DIP Lender, all DIP Facility advances, together with interest thereon accruing pursuant to this DIP Term Sheet, in full, in cash, at the times set forth in this DIP Term Sheet, but no later than ten (10) days after the Termination Date unless the Termination Date is also the Maturity Date.

Subject to the foregoing paragraph, all unpaid principal, interest, fees, costs and expenses on the DIP Facility shall be due and payable in full on the Termination Date, whether at maturity, upon acceleration or otherwise, and if such amounts are not paid in full in cash, interest, fees, costs, and expenses in respect of the DIP Facility shall continue to accrue until paid in full.

**Use Of Proceeds:**

Except as otherwise ordered by the Bankruptcy Court, proceeds of the DIP Facility shall be used solely for the following purposes (and to the extent identified in the Budget): (a) to fund

3

post-petition operating expenses and working capital needs of the Debtor, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930; (b) to pay interest, fees and expenses to DIP Lender in accordance with this DIP Term Sheet, the DIP Financing Documents, and/or the Pre-Petition Loan Agreement (to the extent required under the DIP Financing Documents) and other Pre-Petition Loan Documents (to the extent required under the DIP Financing Documents) (whether or not such amounts are reflected in the Budget); (c) to fund fees and expenses incurred in connection with the 363 Sale (as defined below); (d) to pay permitted pre-petition claim payments and adequate protection payments approved by DIP Lender in writing or set forth in the Budget, if any; (e) to pay Professional Fees and expenses provided for in the Budget; and (f) to pay certain other costs and expenses of administration of the Chapter 11 Case.

Proceeds of the DIP Facility or cash collateral shall not be used (a) to permit any of the Debtor, or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine (or support any other person or entity in challenging or contesting) (i) the validity, perfection or priority of security interests in favor of the Pre-Petition Lender, or DIP Lender, or (ii) the Pre-Petition claim amount of the Prep-Petition Lender pursuant to the Pre-Petition Loan Agreement or enforceability of the obligations of the Debtor or any guarantor under the Pre-Petition Loan Agreement, any other Pre-Petition Loan Documents, the DIP Financing Documents, or the DIP Facility, (b) to investigate, commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim, motion, proceeding or cause of action against Pre-Petition Lender, or the DIP Lender and their agents, employees, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims, (c) to investigate, commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim or proceeding or cause of action to disallow or challenge the Obligations under the Pre-Petition Loan Agreement, any other Pre-Petition Loan Documents, or the DIP Financing Documents, (d) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by DIP Lender, or (e) for any other purpose for which the Carve-Out may not be used.

**Pre-Petition Obligations:**

As of the date of this DIP Term Sheet, the Debtor owe certain obligations under the Pre-Petition Loan Agreement and other Pre-Petition Loan Documents. The indebtedness under the Pre-Petition Loan Agreement shall be satisfied as follows: payments or collateral proceeds received by the Pre-Petition Lender after the

Petition Date (other than proceeds from the 363 Sale, which shall be applied in the manner set forth in the Application of 363 Sale Proceeds section of this DIP Term Sheet) shall be applied first to reduce the prepetition indebtedness under the Pre-Petition Loan Agreement and Pre-Petition Loan Documents before any such amounts shall be applied to reduce any DIP Facility obligations.

| | |
|---|---|
| **Super-Priority Administrative Claim:** | Subject to the Carve-Out, amounts owed by any of the Debtor to DIP Lender pursuant to the DIP Facility (including all accrued interest, fees, costs and expenses) shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code (as defined below), a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code. The foregoing superpriority claim in favor of DIP Lender shall not be payable from any claims or causes of action arising under any Avoidance Actions. |
| **Collateral Security:** | The DIP Facility (including accrued interest, fees, costs and expenses relating thereto) shall be secured by first priority senior and priming liens, subject and junior only to: (i) the Carve-Out; and (ii) valid, enforceable, properly perfected and unavoidable prepetition liens (including any liens that are perfected after the Petition Date with a priority that relates back to a date prior to the Petition Date as permitted under section 546(b) of the Bankruptcy Code) that are senior to the liens of the Pre-Petition Lender; (the "DIP Liens") in all of the Debtor's property, including, without limitation, all of the Debtor's existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, and tax refunds of the Debtor (collectively, the "DIP Collateral"); provided, however, the DIP Collateral shall not include: any Avoidance Actions or the proceeds thereof. |
| **Lien Validation and Perfection:** | All liens authorized and granted pursuant to the Interim Order or the Final Order entered by the Bankruptcy Court approving the DIP Facility or with respect to adequate protection shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection. |
| | The Debtor shall stipulate in the Interim Order and Final Order that (i) the Pre-Petition Lender's liens securing the Pre-Petition |

5

Credit Facility are valid, perfected and have first priority, and such liens encumber all assets of the Debtor, and (ii) except for the Debtor's right to challenge the Disputed Fee, the Debtor possess no claims, offsets or any other type of causes of action against the Pre-Petition Lender which would impair, in any manner, the liens of the Pre-Petition Lender against the Debtor's assets or the Obligations of the Debtor to the Pre-Petition Lender under the Pre-Petition Credit Facility.  The Debtor's stipulations shall be binding upon all parties in interest in the Chapter 11 Case, including any Committee that is appointed, unless (i) an adversary proceeding is filed prior to the expiration of forty-five (45) days after the Petition Date (the "**Review Period**") against the Pre-Petition Lender challenging such party's liens or otherwise asserting estate claims against such party, and (ii) a final, non-appealable judgment is entered against the Pre-Petition Lender in such adversary proceeding; provided, however, any party-in-interest that fails to file an adversary proceeding within the Review Period shall be forever barred from asserting any claims against the Pre-Petition Lender on behalf of the Debtor's estate, or challenging in any manner the liens and claims of the Pre-Petition Lender against the any of the Debtor.

**Release of Claims**

Except for the Debtor's right to challenge the Disputed Fee, in consideration of the furnishing of the DIP Facility, the Debtor and their bankruptcy estates, subject to the rights of another party to bring a Challenge Action during the Review Period, and except as provided in the preceding paragraph, absolutely release and forever discharge each of the Pre-Petition Lender and their affiliates, officers, directors, employees, attorneys, and other representatives from any and all claims and causes of action of every kind and nature that any of the Debtor may hold against such released parties.

**506(c) Surcharge**

Subject to entry of the Final Order:

(i) the Debtor shall waive any right to surcharge the prepetition collateral or DIP Collateral, whether pursuant to Bankruptcy Code sections 506(c) or 105(a) or under any other applicable law; and

(ii) DIP Lender and Pre-Petition Lender shall not be subject to the "equities of the case" exception of Bankruptcy Code section 552(b), or to the equitable doctrines of "marshaling" or any similar claim or doctrine with respect to any DIP Collateral or collateral securing the Pre-Petition Credit Facility.

**Adequate Protection:**

As adequate protection and in consideration for being primed by the DIP Lender's claims and liens, the Pre-Petition Lender

6

(a) shall receive a claim having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and 1114, subject to allowed claims paid under the Carve-Out and super-priority administrative claims of the DIP Lender under the DIP Facility; and (b) shall have valid, binding, enforceable and perfected replacement liens in all DIP Collateral, subject to the DIP Liens and Carve-Out, in each case equal to the sum of the aggregate diminution, if any, subsequent to the Petition Date, in the value of their respective pre-petition collateral (the "Adequate Protection Liens").

**Fees and Expenses:**

The Debtor shall promptly pay or reimburse DIP Lender when invoiced for all reasonable costs and expenses of DIP Lender's counsel and all reasonable costs and expenses of other third parties engaged by DIP Lender, including, without limitation, reasonable costs and expenses incurred in connection with the administration and interpretation of, and the enforcement of remedies under, the DIP Facility including, but not limited to, all due-diligence, valuations, duplication, processing, or printing costs, consultation, travel, and attendance at court hearings, and any other matters relating in any way to any of the DIP Financing Documents regardless of whether the DIP Facility is consummated. DIP Lender shall have the right to charge the DIP Facility for any such reasonable fees and costs (whether such costs were incurred prior to the Petition Date or after the Petition Date) and any fees so charged to the DIP Facility shall accrue interest in accordance with the terms of this Term Sheet as of the date so charged.

**Conditions Precedent:**

The closing of the DIP Facility shall be subject to the following conditions: (a) approval of the Interim Budget and Budget by DIP Lender, together with all financial information and projections regarding the Debtor requested by DIP Lender, all in form and substance satisfactory to DIP Lender, (b) entry of an Interim Order and the Final Order (as applicable) approving the DIP Facility, its superpriority administrative claims and all first priority claims and other liens securing the DIP Facility, and containing such other orders and findings as DIP Lender may require, including automatic modification of the automatic stay upon the occurrence of an Event of Default (subject to the Restraint on Remedies) enabling DIP Lender to exercise certain rights and remedies against the DIP Collateral, which Interim Order or Final Order (as applicable) shall not have been modified or amended without approval of DIP Lender, and shall not have been reversed, vacated or stayed pending appeal, in form and substance satisfactory to DIP Lender, (c) the satisfaction of DIP Lender with all adequate protection payments, critical vendor payments, and all other material

motions and orders filed in the Chapter 11 Case and (e) continuation of the Debtor's present cash management system.

**Affirmative and Negative Covenants:**

To the extent not inconsistent with other covenants set forth herein, all covenants in the Pre-Petition Loan Agreement shall apply to the DIP Facility, other than the covenants set forth in Sections 5.16 5.19, 5.20, 5.21, 6.1 (with respect to Liens existing as of the Petition Date) and 6.4 (with respect to Debt existing as of the Petition Date) of the Pre-Petition Loan Agreement.

The Debtor shall also comply with the following affirmative and negative covenants: (a) compliance with Budget covenants consistent with the section titled "Budget and Variances," (including delivery of Approved Budget Variance Reports), (b) the Debtor shall, from and after the Petition Date, continue to take action and demonstrate progress, satisfactory to DIP Lender in DIP Lender's sole discretion, toward closing a sale of substantially all of the Debtor's assets to the Stalking Horse Bidder (or, as applicable, the Winning Bidder) in accordance with the Milestones and shall demonstrate progress toward, and work to satisfy, all proposed sale conditions imposed in the Stalking Horse Bidder's (or Winning Bidder's) asset purchase agreement; and (c) subject to the terms of the Sale Order and Sale Procedure Order, the Debtor shall, contemporaneously with closing a sale of substantially of all of their assets, direct the 363 Sale purchaser (or closing agent, as applicable) to remit the proceeds of such sale to the DIP Lender for immediate application to the DIP Facility and Obligations under the Pre-Petition Loan Agreement and other Pre-Petition Loan Documents.

**Application of 363 Sale Proceeds:**

Proceeds from the 363 Sale shall be paid as provided in the preceding paragraph directly to DIP Lender upon the closing of the 363 Sale and shall be applied: (i) first, all fees and professional fees payable pursuant to the DIP Financing Documents, (ii) to Polk County for delinquent real property taxes, (iii) third, to outstanding principal indebtedness and other remaining obligations under the DIP Facility and (iv) fourth, to outstanding Obligations under the Pre-Petition Loan Agreement and other Pre-Petition Loan Documents, in the manner set forth in the Pre-Petition Loan Agreement, subject to the Debtor's right to challenge the Disputed Fee (and in the event of any such challenge, an amount equal to the Disputed Fee shall be placed in escrow pending the resolution of such challenge).

**Bankruptcy Court Filings:**

As soon as practicable in advance of filing with the Bankruptcy Court, and in accordance with the dates set forth in the Milestones for the following motions the Debtor and DIP Lender shall coordinate filing (i) the motion seeking approval

8

of, and proposed forms of, the Interim Order and the Final Order, which motion and forms of order shall be in form and substance satisfactory to DIP Lender, (ii) the motions seeking approval of the Sale Procedure Order and the 363 Sale, and the proposed forms of the orders related thereto, which shall be satisfactory to DIP Lender, (iii) all other proposed orders and pleadings related to the DIP Facility, which orders and pleadings shall be in form and substance satisfactory to DIP Lender and consistent with rulings of the Bankruptcy Court in the Debtor's case, (iv) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan or disclosure statement shall comply with the requirements of this DIP Term Sheet), (v) any motion seeking approval of any sale of the Debtor's assets and any proposed form of a related bidding procedures order and sale order (other than those with respect to the bidding procedures and the 363 Sale), and (vi) any motion and proposed form of order filed with the Bankruptcy Court relating to the assumption, rejection, modification or amendment of any material contract (each of the foregoing items (i) through (vi) must be in form and substance reasonably satisfactory to DIP Lender).

**Sale Process:**

Unless otherwise agreed to by DIP Lender, the Debtor shall conduct a sale process for the sale of substantially all of their assets in accordance with the Milestones set forth below.

Broker, the Debtor's counsel, and the Debtor's other professionals, shall oversee the sale process on behalf of the Debtor, including all activities of any advisors retained by the Debtor in connection with the sale process. Broker shall at all times be entitled to take any action necessary or appropriate to conduct the sale process, and shall provide DIP Lender and Debtor with access to all potential bidders and other interested parties, and any information provided to the Debtor by such parties.

Milestones. The Debtor shall be required to comply with the following sale milestones (the "**Milestones**"):

(a)      No later than December 9, 2016, Debtor shall have filed an application for retention of the Broker with the Bankruptcy Court.

(b)      No later than December 16, 2016, Debtor shall have engaged a Broker.

(c)      No later than January 15, 2017, or such later date to which DIP Lender consents in writing, the Debtor shall have selected a Stalking Horse Bidder and filed a motion requesting entry of the Sale Procedure Order (as defined below) and the sale of substantially all of the Debtor's assets to the

9

Stalking Horse Bidder (or Winning Bidder, as applicable) on terms and conditions acceptable to DIP Lender.

(d)     No later than January 27, 2017, or such later date to which DIP Lender consents in writing, the Bankruptcy Court shall have entered the Sale Procedure Order.

(e)     No later than February 24, 2017, or such later date to which DIP Lender consents in writing, the Debtor shall have held the Auction (as defined below).

(f)     No later than March 3, 2017, or such later date to which DIP Lender consents in writing, the Bankruptcy Court shall have entered the Sale Order (as defined below) approving the 363 Sale, the results of the Auction and the winning bid received at the Auction.

(g)     On or before the date that is fourteen (14) days after entry of the Sale Order, provided that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h) or such later date to which DIP Lender consents in writing, the 363 Sale shall be closed, with proceeds of the 363 Sale paid directly to DIP Lender to be applied to the obligations under the DIP Facility.

Notwithstanding anything to the contrary herein, the Bankruptcy Court may set dates with respect to the Milestones beyond the outer dates specified above to accommodate its own schedule and to the extent the Bankruptcy Court makes such an extension, the Milestones hereunder shall be automatically extended by the same period as the Bankruptcy Court's extension. Additionally, DIP Lender and Pre-Petition Lender acknowledges it will consider extending the Milestones described in clause (c) through (g) above, to the extent the Broker recommends, in its professional judgment, alternative Milestones for purposes of maximizing the proceeds of the 363 Sale. Such determination by DIP Lender and Pre-Petition Lender shall be made in good faith in the exercise of reasonable (from the perspective of a secured lender) credit or business judgment taking into account all facts and circumstances existing at such time.

DIP Lender and the Pre-Petition Lender  shall have the right to "credit bid" any prepetition or postpetition secured obligations owed to it in any sale of the Debtor's assets.

| | |
|---|---|
| Representations and Warranties: | The representations and warranties of the Debtor set forth in the Pre-Petition Loan Agreement and other Pre-Petition Loan Documents (other than those set forth in <u>Sections 4.6</u>, <u>4.10</u>, <u>4.11</u>, (with respect to Debt incurred as of the Petition Date and under this DIP Facility), <u>4.12</u> (with respect to the Chapter 11 Case and proceedings brought prior to the commencement hereof by Pre-Petition Lender), and except as otherwise disclosed to the DIP Lender in writing, are hereby incorporated in all material respects into this DIP Term Sheet as if made on the date thereof (except to the extent such representations and warranties expressly relate to an earlier date, in which case they are true and correct in all material respects as of such earlier date). |
| Additional Conditions to Each Borrowing Under the Facility: | There shall exist no Event of Default (or event that would constitute an Event of Default with the giving of notice or lapse of time) under any of the DIP Financing Documents, and the representations and warranties therein shall be true and correct in all material respects. |
| | There shall have occurred no material adverse change in the Debtor's (financial, environmental, or otherwise) operations, performance, or properties (other than the commencement of the Chapter 11 Case), since the date of this DIP Term Sheet, that in the judgment of DIP Lender, has or could be expected to have a material adverse effect on the rights and remedies of DIP Lender or on the ability of the Debtor to perform their obligations under the DIP Facility. |
| | DIP Lender shall be satisfied that Debtor are continuing to take action and demonstrating progress toward closing a sale of substantially all of the Debtor's assets in accordance with the Milestones to the Stalking Horse Bidder (or, as applicable, the Winning Bidder) and are working toward satisfying all proposed sale conditions imposed in the Stalking Horse Bidder's (or Winning Bidder's) asset purchase agreement. |
| Remedies: | Upon the occurrence of an Event of Default or the Termination Date, and the transmission of written notice thereof to counsel for the Debtor, any Committee, and the U.S. Trustee, then DIP Lender shall be fully authorized, in its sole discretion to: (i) cease making DIP Facility advances to the Debtor; (ii) terminate the Debtor's use of the DIP Collateral (including, without limitation, cash collateral), and/or (iii) immediately terminate the DIP Facility and demand immediate repayment, in cash, of the DIP Facility obligations then outstanding. The foregoing remedies (i)-(iii) of DIP Lender shall not be subject to any Restraint on Remedies (as defined below), including the five (5) day advanced notice of DIP Lender's intent to exercise any such remedies. |
| | Additionally, upon the occurrence of an Event of Default or the |

11

Termination Date, DIP Lender will also have other customary remedies, including, without limitation, the ability to foreclose upon and/or sell the DIP Collateral and the right to exercise any remedy available under applicable law, without the necessity of obtaining any further relief or order from the Bankruptcy Court; provided, however, that DIP Lender shall provide the Debtor and Committee (if any) with five (5) days written notice of DIP Lender's intent to exercise such other customary remedies, subject to the right of the Debtor or any Committee appointed by the Bankruptcy Court to seek an injunction (such an injunction obtained within five (5) day after notice of intent to exercise remedies, a "Restraint on Remedies"), provided, further, however, that the collection and application of proceeds remitted to one or more lockbox accounts, controlled accounts, or other accounts subject to DIP Lender's control shall not be subject to any Restraint on Remedies, and nothing herein shall impair or restrict DIP Lender's rights to collect or apply any proceeds remitted to one or more lockbox accounts, controlled accounts, or other accounts subject to DIP Lender's control. Section 362 relief from the stay in favor of DIP Lender shall be embodied in any order approving the DIP Facility and the use of cash collateral.

**Additional Conditions To Financing:**

Compliance with Bankruptcy Rule 4001 and any applicable Local Bankruptcy Rules, the entry of the Interim Order and the Final Order (as applicable), together with any other order requested by DIP Lender authorizing and approving the DIP Facility in form, substance and amount and providing for the DIP Collateral, all acceptable to DIP Lender.

Payment of all fees and expenses owing to DIP Lender in connection with the DIP Facility.

The DIP Financing Documents and the Interim and Final Orders shall include such waivers, indemnities, and other provisions as are acceptable to DIP Lender.

**Events of Default:**

Defaults and Events of Default shall mean the occurrence of any of the following:

- Any of the Debtor shall, without DIP Lender's prior written consent, take any action that (or fail to take any action that could reasonably be expected to) results in (i) any of Current Management ceasing to be employed by the Bright's Creek Receiver or incurring a material change Current Management's job duties or (ii) Bright's Creek Receiver becoming removed from its position.

- Any of the Chapter 11 Case shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or

the filing of a motion requesting such relief that the Debtor fail to timely oppose unless otherwise agreed in writing by DIP Lender.

- Filing or support of a proposed plan of reorganization by any Debtor that does not provide for the payment in full and in cash of the Debtor's obligations outstanding under the DIP Facility, unless otherwise agreed in writing by DIP Lender.

- Entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization that does not require the indefeasible repayment in full, in cash of the DIP Facility as of the effective date of the plan, unless otherwise agreed in writing by DIP Lender.

- Appointment of a trustee for any of the Debtor under Section 1104 of the Bankruptcy Code without the express written consent of DIP Lender, or the filing of any motion or other pleading requesting such relief which the Debtor fail to timely oppose.

- Appointment of an examiner with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code for any of the Debtor without the prior written consent of DIP Lender, or the filing of a motion or other pleading requesting such relief which the Debtor fail to timely oppose.

- Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility, the Interim Order or Final Order approving the DIP Facility, or any other DIP Financing Documents, without the prior written consent of DIP Lender or the filing of a motion or other pleading requesting such relief which the Debtor fail to timely oppose.

- Any attempt by any Debtor to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair the claims of the DIP Lender or Pre-Petition Lender or to subject any of such parties' collateral to a surcharge pursuant to Section 506(c) of the Bankruptcy Code.

- Any Debtor shall request approval of any postpetition financing, other than the DIP Facility, which would not immediately repay all indebtedness and other obligations under the Pre-Petition Loan Documents and the DIP Facility in full, in cash, on the date of the closing of such postpetition financing.

13

- Any Debtor shall apply for an order substituting any assets for all or any portion of the DIP Collateral.

- Entry of an order granting liens or claims that are senior or *pari passu* to the liens granted in favor of the DIP Lender under the DIP Financing Documents.

- Any party in interest (including the Debtor) shall assert that any of the DIP Liens or DIP Facility obligations is invalid, or any DIP Liens granted to or DIP Facility obligations owed to the DIP Lender shall be determined to be invalid.

- Any payment on, or application for authority to pay, any pre-petition claim of the Debtor without the prior written consent of DIP Lender.

- At any time after the engagement of Broker, Broker ceases to be involved in the sale process or the sale process is halted.

- A final order is entered granting any creditor with a claim in excess of $50,000 relief from the automatic stay, unless otherwise agreed in writing by DIP Lender.

- Failure to make all payments under the DIP Facility when due.

- Failure to pay any post-petition material indebtedness.

- Breach of any term or covenant of the DIP Facility or in any DIP Financing Document.

- Any representation or warranty by any Debtor is incorrect in any material respect when made.

- Plan exclusivity shall have been terminated or any Debtor shall have agreed to any such termination.

- After entry thereof, either of the Sale Procedure Order or the Sale Order shall cease to be in full force and effect, shall have been reversed, stayed, vacated or subject to stay pending appeal or shall have been modified or amended without the express written consent of DIP Lender.

- Unless consented to by DIP Lender in writing, the Stalking Horse Bidder designated in the motion seeking approval of the Sale Procedures Order shall drop out of the sale process or otherwise indicate that it is unable to close the 363 Sale in accordance with the Milestones herein, unless a back-up bidder is qualified to bid under substantially the same terms and conditions as the Stalking Horse Bidder within five days thereafter.

- Any Loan Party shall take (or support any other Person in taking) any action in order to restrict or prohibit DIP Lender, or the Pre-Petition Lender from submitting a

"credit bid" for any assets of the Debtor.

- The failure to disburse the 363 Sale proceeds to the DIP Lender, and Pre-Petition Lender contemporaneously with the closing of the 363 Sale.

- Any Challenge Action (as such term is defined in the interim or final order approving the DIP Facility) is commenced against the Pre-Petition Lender.

- The commencement of an action or filing of a motion challenging the rights and remedies of the DIP Lender under the DIP Financing Documents or that is otherwise inconsistent with the DIP Financing Documents.

- Any matters that give rise to the Termination Date.

So long as no Event of Default has occurred, DIP Lender shall not seek the appointment of a Chapter 11 Trustee or conversion of the case to Chapter 7 while the Debtor and DIP Lender are seeking interim and final approval of this DIP Facility

Governing Law:    All documentation in connection with the DIP Facility shall be governed by the laws of the state of Delaware, subject to applicable federal bankruptcy laws.

**Other Definitions:**

**"363 Asset Purchase Agreement"** means a Third-Party Asset Purchase Agreement for the sale of substantially all of the assets of the Debtor to the Stalking Horse Bidder, which 363 Asset Purchase Agreement shall be satisfactory to DIP Lender.

**"363 Sale"** means the sale of all or substantially all of the assets of the Debtor under Section 363 of the Bankruptcy Code.

**"Auction"** means an auction held in connection with the 363 Sale and in accordance with the provisions set forth in the Sale Procedure Order.

**"Avoidance Actions"** means any avoidance causes of action that could be brought relating to prepetition transfers pursuant to sections 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code, or any applicable state fraudulent transfer statutes.

**"Bankruptcy Code"** means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of Florida Miami Division, presiding over the Chapter 11 Case.

**"Bright's Creek"** means Bright's Creek Golf Club, LLC, a North Carolina limited liability company.

**"Bright's Creek Receiver"** means Mark Rudow, the court-appointed receiver for Bright's Creek.

**"Broker"** means Land Advisors Resort Solutions or such other Person acceptable to DIP Lender.

**"Budget"** means the budget of the Debtor relative to the operations of the Debtor in the Chapter 11 Case for any fiscal period, as delivered to DIP Lender in form and substance satisfactory to DIP Lender. A preliminary Budget through January, 2017 (the "**Interim Budget**") must be approved by DIP Lender and must be attached to the Interim Order. A Budget covering the period from the date of entry of the Final Order through the Maturity Date must be delivered by the Borrowers to DIP Lender at least 7 business days before, and shall be approved by DIP Lender at least 2 business days before, any hearing related to final approval of the DIP Facility and must be attached to the Final Order.

**"Carve-Out"** means a carve-out for:

(i) unpaid postpetition fees and expenses of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930;

16

(ii) unpaid postpetition fees and expenses of professionals of the Debtor and any Committee retained by an order of the Court pursuant to section 327, 328, 363 or 1103(a) of the Bankruptcy Code (the "**Professionals**") incurred prior to a Termination Event, but only to the extent that to the extent such fees and expenses are (a) incurred before the Termination Event, (b) within the amounts set forth in the Budget approved by DIP Lender for such Professional through the date of the Termination Event, (c) subsequently allowed by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code, and (d) not otherwise paid from retainers or any professional expense escrow account established by the Debtor; and

(iii) postpetition fees and expenses of the Professionals incurred after the occurrence of a Termination Event in an aggregate amount not to exceed $75,000 (in the aggregate for the Debtor's Professionals and the Committee's Professionals with respect to fees incurred prior to or after a Termination Event), to the extent such fees and expenses are (a) subsequently allowed by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code, and (b) not otherwise paid from retainers or any professional expense escrow account established by the Debtor.

Provided, however, that (a) the Carve-Out shall only be available to pay fees and expenses set forth herein to the extent that unencumbered funds are not otherwise available; (b) in no event shall the Carve-Out for each Professional exceed the amounts for postpetition fees set forth for such professional in the Budget as of any applicable date of determination; and (c) in no event shall the aggregate amount of items included in the Carve-Out for the Debtor's Professionals and the Committee's Professionals exceed $75,000 in the aggregate with any additional amount determined for the Committee's Professionals by subsequent agreement of the DIP Lender.

The Carve-Out shall not include payment for any fees and expenses, if any, of the Professionals incurred directly or indirectly, in respect of, arising from or relating to:

(i) the initiation, joinder, support, or prosecution of any action contesting the indebtedness owed to the Pre-Petition Lender or DIP Lender, or the validity of any liens granted to any such parties;

(ii) preventing, hindering or otherwise delaying (or supporting any other person or entity in preventing, hindering or otherwise delaying), whether directly or indirectly, the exercise by the DIP Lender or Pre-Petition Lender of any of its rights and

17

remedies under the Interim Order, Final Order, or documents comprising the DIP Facility, DIP Financing Documents, Pre-Petition Loan Agreement, or other Pre-Petition Loan Documents;

(iii) the commencement, support, or prosecution of any action or proceeding of any claims, causes of action or defenses against the DIP Lender, the Pre-Petition Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, participants, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from the DIP lender, Secured Parties, or Pre-Petition Lender;

(iv) any request to borrow money other than pursuant to the terms of the Interim Order, the Final Order, or the documents comprising the DIP facility;

(v) with respect to the Debtor, any of the Debtor's Professionals, or any of their successors or assigns (including, without limitation, any trustee, responsible officer, examiner, estate administrator or representative or similar person appointed in a case for any of the Debtor under any chapter of the Bankruptcy Code) performing or commencing any investigation or litigation (whether threatened or pending) by the Debtor with respect to any matter released or to be released, waived, or to be waived, or specified as not subject to challenge by the Debtor pursuant to the Interim Order or Final Order; or

(vi) for any other purpose for which proceeds of the DIP Facility may not be used pursuant to this DIP Term Sheet.

"**Chapter 11 Case**" means the voluntary Chapter 11 Case commenced by Debtor, case no. 16-24483-AJC, in the Bankruptcy Court.

"**Committee**" means any statutory committee appointed in the Chapter 11 Case.

"**Current Management**" means East West Partners Club Management Company, Inc., a North Carolina corporation, the property manager for Bright's Creek engaged by the Bright's Creek Receiver.

"**Disputed Fee**" means the amount of the "Prepayment Fee" (as defined in the Pre-Petition Loan Agreement) and interest accrued thereon. For the avoidance of doubt, Debtor acknowledges and agrees the amount owed under the Pre-Petition Loan Documents consisting of principal, accrued interest (including interest accrued at the default rate) and Pre-Petition Lender's fees and expenses, including reasonable attorney's fees and expenses, is an amount equal to $12,255,181.16 as of the Petition Date. For

18

the avoidance of doubt, Pre-Petition Lender asserts the Disputed Fee is an amount equal to $1,921,421.74 as of the Petition Date (which includes interest accrued on such Prepayment Fee as of the Petition Date).

"**Final Order**" means a final, non-appealable order of the Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the liens and security interests contained therein, on terms satisfactory to DIP Lender.

"**Interim Order**" means an interim order of the Bankruptcy Court authorizing the Debtor, among other things, to obtain interim financing and incur post-petition indebtedness pursuant to the DIP Facility on terms satisfactory to DIP Lender.

"**Maturity Date**" means March 17, 2017.

"**Petition Date**" means the date on which the Chapter 11 Case was filed with the Bankruptcy Court.

"**Pre-Petition Credit Facility**" means the financial accommodations furnished to Debtor and Bright's Creek pursuant to the Pre-Petition Loan Agreement and other Pre-Petition Loan Documents.

"**Pre-Petition Lender**" means Lantern Business Credit, LLC.

"**Pre-Petition Loan Documents**" means, collectively, (i) each of the agreements, instruments, and other documents executed in connection with the Pre-Petition Loan Agreement, including, without limitation, each of the Other Documents (as such term is defined in the Pre-Petition Loan Agreement); and (ii) the Pre-Petition Loan Agreement.

"**Professional Fees**" means fees and expenses incurred by, and/or payable to, any Professionals.

"**Sale**" means a sale of all or substantially all of the Debtor's assets.

"**Sale Order**" means the order entered by the Bankruptcy Court in form and substance satisfactory to DIP Lender that, among other things, approves the 363 Sale, the results of the Auction and the Winning Bidder's bid received at the Auction or the Stalking Horse Bidder's bid (if no Auction is held).

"**Sale Procedure Order**" means an order in form and substance satisfactory to DIP Lender approving (a) the bidding procedures to be applicable to the 363 Sale and (b) subject to higher and better bid, the proposed form of the 363 Asset Purchase Agreement.

"**Stalking Horse Bidder**" shall mean the proposed purchaser under the 363 Sale Asset Purchase Agreement (which purchaser shall be satisfactory to DIP Lender) that has agreed to serve as the "stalking horse" for the 363 Sale and irrevocably committed, subject only to requisite Bankruptcy Court approval, to acquire substantially all of the Debtor's assets via the 363 Sale Asset Purchase Agreement. For the avoidance of doubt, Lantern Business Credit may be the Stalking Horse Bidder.

"**Termination Event**" means the occurrence of the earlier of:

(i) an Event of Default under the DIP Facility;

(ii) the Debtor's failure to comply with the terms of the Interim Order or Final Order (including, without limitation, their failure to comply with the Budget, subject to any approved variances); or

(iii) the Debtor's failure to comply with any of the Milestones.

"**Third-Party Asset Purchase Agreement**" means an asset purchase agreement by and among the Debtor and a third party purchaser that provides for the purchase and sale of substantially all of the assets of the Debtor, which third party purchaser and asset purchase agreement are satisfactory to DIP Lender.

"**Winning Bidder**" means the bidder that (a) agrees at the Auction to purchase all or substantially all of the assets of the Debtor pursuant to a Third-Party Asset Purchase Agreement, and (b) is acceptable to DIP Lender.

[Remainder of Page Intentionally Left Blank]

**ACKNOWLEDGED AND AGREED:**

<u>**DEBTOR:**</u>

**ALIANZA TRINITY DEVELOPMENT GROUP LLC.,**
a Florida limited liability company

By:  **Alianza Trinity Holdings LLC,**
     its Managing Member

     By: _____
     Name: Omar Botero
     Title: Manager

<u>**LENDER:**</u>

**LANTERN BUSINESS CREDIT, LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

21

ACKNOWLEDGED AND AGREED:

<u>DEBTOR</u>:

ALIANZA TRINITY DEVELOPMENT GROUP LLC.,
a Florida limited liability company

By:    **Alianza Trinity Holdings LLC,**
        its Managing Member

        By:    _____
        Name:  Omar Botero
        Title:  Manager

<u>LENDER</u>:

LANTERN BUSINESS CREDIT, LLC,
a Delaware limited liability company

By:    _____
Name:  WILLIAM SRINIVASAN
Title:  AUTHORIZED SIGNATORY

21